*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2016).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-0613**

Grace Elizabeth Miller, petitioner,
Respondent,

vs.

Brock Fredin,
Appellant.

**Filed January 23, 2017
Affirmed
Ross, Judge**

Ramsey County District Court
File No. 62-HR-CV-16-46

Karmen McQuitty, University of Minnesota Student Legal Service, Minneapolis, Minnesota (for respondent)

Nathan M. Hansen, North St. Paul, Minnesota (for appellant)

Considered and decided by Ross, Presiding Judge; Schellhas, Judge; and Jesson, Judge.

## UNPUBLISHED OPINION

**ROSS**, Judge

Quoth the Raven, "Nevermore." The district court granted Grace Miller a harassment restraining order against Brock Fredin after Miller ended their romantic relationship. Fredin argues on appeal that his post-relationship internet posting was just a personal reflection akin to Edgar Allan Poe's poem about his lost beloved, Lenore—a kind

of communication that Fredin insists can never constitute harassment. He maintains that the district court failed to make a particularized finding of harassment and that Miller produced insufficient evidence to establish repeated incidents of harassment. We see no error in the district court's findings, and we are convinced from the record that, unlike Poe's yearning for Lenore, Fredin's repeated unwanted contact with Miller can support the district court's finding of harassment. We therefore affirm.

## FACTS

Grace Miller and Brock Fredin met online and dated for about a month. Miller ended their exclusive dating relationship near the end of October 2015, but they continued as friends. The relationship deteriorated as reflected in a series of Facebook and text-message conversations from early December 2015. Fredin's messages annoyed Miller and began to make her uncomfortable. On December 3, they had the following Facebook exchange:

> B.F.  What are you thinking about?
> G.M.  Sleep
> B.F.  Thinking about me I bet…
> G.M.  Nope. Goodnight.
> B.F.  I am coming over

According to Miller, she turned off all the lights in her house and locked herself in her bedroom because she was unsure whether Fredin would visit. Fredin sent Miller a text message again the next evening saying he was "stopping over." Miller responded, "No, please don't. I don't want a visitor tonight."

As it became apparent that Miller wanted no relationship with Fredin, Fredin's messages became unsettling:

2

G.M. how [a]bout we be friends. . . .

B.F. Nope. We are dating. Yes, you're taking me to see your family.

. . .

G.M. I'm done talking to you tonight. . . .

B.F. Be a good girl for me. Here's a hot photo of what you can't have.
[webcam photo of Fredin]

. . .

B.F. Too bad you aren't in this tonight on your knees thinking of me. ;)
[photo of woman in lingerie]
You should have nightly tasks.

G.M. Stop it.

B.F. You really should meditate nightly, get on your knees, and think of me. It's good for your mental health.
Also you're not going on any more first dates.

. . .

B.F. Why are you opposed to these things?

G.M. because I don't want a relationship with you anymore. I told you[.]

B.F. You do and will though. You need it. . . .

. . .

B.F. You're a very boring person. You have zero interests or excitement in your life. I would never be your friend. However, I will go on occasional dates with you and you're taking me out for my birthday.

On December 8 and 9, Miller unequivocally expressed that she no longer wanted to see or hear from Fredin:

G.M. yeah, I can forgive you, but I'm not going out with you.

B.F. Please let's still go on the occasional date, Grace. I was just seeing if you were into alpha guys. It was a thought experiment. I want to do so much for you.

G.M. no! I agreed to do that and it didn't work. because you forbade me from seeing other guys and smashed your face into my mouth when I tried to pull away from kissing you and now you're going completely f--king psychotic when I break things off. why on earth would I want more of this?

. . .

3

G.M. Second, I didn't want to encourage your delusion that we're dating when we're not. Or start another multi-day begging session. I'm tired.

B.F. Oh my gosh! Come on. It was a thought experiment weekend. Thought we were erasing that. You are amazing, Grace.
We are going on the occasional date. I'd like if you took me out for my birthday.

G.M. F--k you and your cruel thought experiments. You've done this s--t before.
We are NOT going on the occasional date. I am done talking to you.

. . .

B.F. Sweetie, you said you liked alpha guys. I was just trying to see if that was true. Go easy on me. You know my true personality!

. . .

B.F. Where are you taking us for my birthday? I'd like if you reconsidered and just remembered it was a thought experiment. I'd really like this to be a date. I wish you'd call me on the phone. It would be much easier. Did you find another guy or something?

G.M. No means no or seriously I will never speak to you again. I'm sick of this. NO.

B.F. May I please ask why? I love you Grace!

G.M. I've been telling you why for four f--king days. I'm going to bed.

Miller blocked Fredin's Facebook account that night. But he sent her a text message

the next day:

B.F. I am kind of depressed you're not taking me out on Saturday for my birthday. No one ever has. Can't you be nice and go easy on me?

G.M. I've been telling you no for four days. Don't contact me again.

B.F. I am really sorry. Please forgive me. I'm begging you.

. . .

G.M. No. Do not contact me again. Enough is enough. This is out of hand. Trying to block this number. Stop.

Circumventing Miller's attempt to block Fredin's communication, Fredin sent another text message from a different phone number that same day, asking for forgiveness. Miller did not respond and blocked both numbers. The next morning she received a text message from an unknown number. It was Fredin. Miller reiterated that he should leave her alone. She warned that if he contacted her again, she would call the police.

Fredin emailed Miller anyway on January 3, 2016, and Miller responded, "No. I told you to leave me alone. . . . [T]his is stalking and harassment. I was serious when I said I would call the cops. If you contact me again, I will." Miller blocked Fredin's email address. But Fredin emailed her twice on January 24. He also circumvented the email block by sending Miller $50 through PayPal.com with the message, "Thank you for everything." Miller did not respond to the emails and rejected the PayPal payment with the message, "I don't want your money." Miller finally called the police, who suggested that she ask the district court for a harassment restraining order.

Miller filed for a harassment restraining order on January 28. The district court granted a temporary restraining order, and a deputy sheriff served Fredin with the order on February 2. Miller received a notification on February 9 that Fredin had viewed her Match.com profile. She saw that his public profile included a note that read, "To a lost love: Incredibly sorry Grace. Sorry for what happened. NEVER intended anything of that nature. . . ." Miller sent a message to Fredin demanding that he remove her name from his profile. Fredin responded by adding more details to the note. She sent him a message the next day demanding that he remove the post.

Miller and Fredin testified at the restraining order hearing on March 21. Miller explained that she was earnest when she told Fredin to stop contacting her, that his continued contact was unwanted and intrusive, and that his conduct exacerbated her depression and anxiety, caused her stress, and made her paranoid. The district court recognized that relationship endings often involve ambiguous communication, but it found that "Ms. Miller was clear she didn't want to have contact." The court found that Fredin continually contacted Miller using email, text messages, and telephone after Miller blocked his communication by Facebook and phone. It chose not to make any finding about the Match.com note. The district court issued the harassment restraining order against Fredin using a preprinted order form. It checked the requisite boxes and entered as "other" grounds for harassment, "respondent made repeated, unwanted contact with petitioner by continuing to communicate with petitioner despite being asked to stop all contact, having the Facebook account blocked and two separate telephone numbers blocked."

Fredin appeals.

**DECISION**

Fredin argues that the district court improperly issued the harassment restraining order. A district court may issue a harassment restraining order if it has "reasonable grounds to believe that the respondent has engaged in harassment." Minn. Stat. § 609.748, subd. 5(b)(3) (2014). "Harassment" is defined in relevant part as "repeated incidents of intrusive or unwanted acts, words, or gestures that have a substantial adverse effect or are intended to have a substantial adverse effect on the safety, security, or privacy of another." Minn. Stat. § 609.748, subd. 1(a)(1) (2014). We review the grant of a harassment

6

restraining order for an abuse of discretion, and we will reverse if the order is not supported by sufficient evidence. *Kush v. Mathison*, 683 N.W.2d 841, 843–44 (Minn. App. 2004), *review denied* (Minn. Sept. 29, 2004). We defer to the district court's credibility determinations, and we will not set aside its fact-findings unless they are clearly erroneous. *Id.*

Fredin asserts that the district court failed to make a particularized finding of repeated incidents of harassment. The controlling statute requires that "the court find[] *at the hearing* that there are reasonable grounds to believe that the respondent has engaged in harassment." Minn. Stat. § 609.748, subd. 5(b)(3) (emphasis added). The statute nowhere requires the district court to make any other findings before issuing a harassment restraining order. The district court found that Fredin engaged in repeated, unwanted contact. This meets the requirement of subdivision 5(b)(3). And Fredin offers no authority prohibiting the district court from using a preprinted order form to record its findings. The district court checked the requisite boxes and added sufficient details to explain the basis for its order.

Fredin argues that Miller did not prove repeated incidents of harassment. The record proves him wrong. The district court found that Miller communicated to Fredin that she wanted no further contact with him in early December by telling him so and by blocking his Facebook account and phone numbers. The district court also found that Fredin's later emails in January and his text messages from a third, unknown phone number were repeated unwanted contact. The court heard Miller's testimony and received copies of the Facebook messages, text messages, and emails. Fredin admitted to emailing Miller and

7

sending her money through PayPal on January 24. Even if the exchanges in early December were ambiguous, Miller clearly told Fredin not to contact her again on three occasions, and Fredin ignored Miller's urging to be left alone. Sufficient evidence also supports the district court's finding that Fredin's persistent, unwanted communication in the face of Miller's attempts to prevent the communication substantially affected Miller's safety and privacy.

Fredin ultimately argues that his single, so-called "open letter" on his Match.com profile cannot constitute harassment. He urges us to characterize his post instead as just his remorseful reflection about unrequited adoration, because, as he puts it, he was merely "*faute de mieux* . . . shar[ing] his feelings in a personal way, as if in a journal." He caps the argument by quoting substantially from the following lovesick stanza of Edgar Allan Poe's *The Raven*, to which he asks us to liken his Match.com post:

> Ah, distinctly I remember it was in the bleak December
> And each separate dying ember wrought its ghost upon the floor.
> Eagerly I wished the morrow;—vainly I had sought to borrow
> From my books surcease of sorrow—sorrow for the lost Lenore,
> For the rare and radiant maiden whom the angels name Lenore:
>     Nameless here for evermore.

Fredin's attempt to analogize his internet post to Poe's celebrated poem ignores the fact that the district court expressly did not base its harassment finding on Fredin's post but rather on the fact that he pursued Miller even after she told him that his continued overtures were unwelcome, harassing, and stalking, and that she would call the police if he persisted. Relying on the poem therefore both oversells on sympathy and understates on conduct. And we offer—purely as dictum—that when one is characterized, rightly or wrongly, as a frighteningly obsessive ex-boyfriend eligible for a harassment restraining order, the typical

8

strategy for a reversal does not include aligning oneself with an allegedly opium-inspired author whose obsession with his deceased lover and other macabre poetry and prose are most commonly narrated for their chilling effect.

**Affirmed.**